[No. B066067. Second Dist., Div. Four. Feb. 17, 1994.]

MANHATTAN SEPULVEDA, LTD., Plaintiff and Appellant, v.
CITY OF MANHATTAN BEACH, Defendant and Respondent.

**COUNSEL**

Whitesell, Ralls & Stroh, Whitesell & Stroh and Herbert A. Stroh for Plaintiff and Appellant.

Carl K. Newton, City Attorney, Burke, Williams & Sorensen and Terry P. Kaufmann for Defendant and Respondent.

**OPINION**

VOGEL (C. S.), J.—

### STATEMENT OF THE CASE

This is an appeal taken from the superior court's decision to deny a petition for a writ of mandate filed by a property owner. At issue is a municipal code section which permits reconstruction of a nonconforming building damaged by fire if the cost to repair does not exceed 50 percent of the building's value prior to the fire. The municipality successfully urged

that value meant the cost to replace the entire building. Our review of the record convinces us that there is no basis to sustain such an interpretation. Instead, we conclude that value should be defined as the fair market value of the structure at the time of the fire. We therefore reverse the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Manhattan Sepulveda, Ltd. (appellant), owned a two-story commercial building in Manhattan Beach. The building provided office and service business space. The tenants included a tailor, tanning salon, hair salon, and travel agency. In July 1990, a fire damaged a large portion of the structure. Although the building did not conform with some building requirements, its use was lawful.[1] Appellant applied to the City of Manhattan Beach (City) for permission to restore the building to its prior nonconforming use. City's community development department (CDD) determined, based upon its interpretation of former section 10-3.1510 of its municipal code,[2] that appellant could no longer continue its nonconforming use. The section, titled "Reconstruction of nonconforming buildings partially destroyed or damaged," provides: "A nonconforming building destroyed or *damaged to the extent of not more than fifty (50%) per cent of its value at the time of its destruction by fire*, explosion or other casualty or Act of God, or the public enemy, may be restored and the occupancy or use of such building or part thereof which existed at the time of such partial destruction or damage may be continued subject to all other provisions of this article." (Italics added.)

City's CDD determined that the amount of damage caused by the fire exceeded 50 percent of the value of the building. CDD defined "value at the time of destruction" as being the current cost to replace the entire building— $529,681. It computed the total cost of fire damage replacement and repair to be $276,377. Because the cost to repair exceeded 50 percent of the building's value ($264,840), it concluded that section former 10-3.1510 was inapplicable. Thus, if appellant wished to rebuild, it would be required to eliminate all of the nonconforming uses by complying with current state and City codes. This would result in an additional expenditure to appellant of $300,000 to $400,000.

Appellant took issue with City's interpretation of the phrase "not more than fifty (50%) per cent of [the] value [of the building] at the time of its destruction." (former § 10-3.1510.) It contended that value meant the

---

[1]The building was nonconforming in terms of the number of available parking spaces, depth of the front yard setback, lack of an automatic sprinkler system, and failure to comply with various handicapped and energy requirements.

[2]All subsequent section references are to City's municipal code as it was in effect at the time of the pertinent events. We refer to them as former sections because they have since been renumbered without any substantive changes.

building's present fair market value, not the present cost to build the structure. Appellant presented an appraisal setting the fair market value of the building at $695,000.[3] Appellant therefore urged that the fire destruction did not exceed 50 percent of the building's value ($347,500) as measured by fair market value.

To pursue its point, appellant contested the CDD's decision. The city council referred the appeal to the board of building appeals for review and recommendation. The board voted three to one to allow appellant to rebuild the nonconforming use and forwarded its recommendation to the city council.

The city council conducted a public hearing in December 1990. Appellant's representative stated that it had asked City "for any prior history of the application of [§ 10-3.]1510 [and that] [t]here is none that we've been presented with. Nobody on the staff has been able to find that [§ 10-3.]1510 has ever been applied before." Statements from the city attorney and a building official established that, to a large extent, City was defining value as the cost to replace because that was the method explicitly set forth in another portion of the Municipal Code—former section 10-3.1511.[4] However, that section, titled "Enlargement or alteration of nonconforming buildings," does *not* address the reconstruction of a nonconforming building damaged by an act of God; instead, it addresses the property owner's voluntary decision to enlarge or alter a nonconforming structure. Thus, the section provides, in pertinent part: *"No nonconforming building shall be enlarged or altered if the total estimated construction cost of the proposed enlargement or alteration*, plus the total estimated construction costs of all other enlargements or alterations for which building permits were issued within the preceding thiry-six (36) month period, *exceeds fifty (50%) percent*

---

[3]The land was valued at $375,000.

[4]For instance, the city attorney advised the council: "[I]t is my understanding that the practice of staff has been to utilize the same approach in determining value as in the case of destruction of a non-conforming building or partial destruction, and a determination as to whether the alteration or enlargement of the non-conforming building was to be—was to go forward for the purpose of determining the value of the structure itself. And the cost of estimating—pardon me, the estimated cost of reconstruction was the use in the trade, in effect, that was pursued by staff in each instance *even though there was different wording in the code*. . . . [¶] It's my understanding that that approach has been followed consistently for a number of years; and, therefore, I think that establishes the pattern of the approach to valuation as it's been applied in this case."

Additionally, Dr. Mohamed Ganaba, a building official, informed the council that defining value as the cost to replace "is the only method available to the staff, and this has been fairly used to evaluate all new building[s] or remodels if it's conforming or non-conforming; and in case of fire damage, the city does not have a great history in large fire damage, but we use the same method to evaluate small fire damage, for example, residential garage and so forth."

*of the total estimated cost of reconstructing the entire nonconforming building*, unless the proposed enlargement or alteration would render the building conforming."

The city attorney conceded that were value defined as fair market value, appellant would be able to rebuild the nonconforming use regardless of which estimate of cost to repair were used. Following the hearing, the city council adopted, by a vote of three to two, a resolution which made, inter alia, the following findings: "1. That the Community Development Department fire damage cost estimate of $276,377.00 and the building improvement value of $529,681.00 prior to fire evaluation were consistent and based on an established method using the Building Valuation Data. [¶] . . . 3. That the term 'value' in the Manhattan Beach Municipal Code, Section 10-3.1510, is defined by custom, usage and practice as replacement cost and not fair market value."

Thereafter, City retained an independent private consultant to determine the extent of the fire damage. Another public hearing was conducted in June 1991. The consultant's report, predicated upon defining value as replacement cost, concluded that the cost to repair the fire damage exceeded 50 percent of the building's value. Appellant presented evidence that many of the prior fire situations in which City had used replacement cost dealt with garages, not business structures, and that a different ordinance—former section 10-3.1510.1—addresses that particular situation.[5] Nonetheless, the city council denied, by a vote of three to two, appellant's administrative appeal.

Appellant thereafter filed a petition for writ of mandamus in the superior court, seeking an order to compel City to set aside its decision and to allow appellant to rebuild the property to its prefire legal nonconforming use. Following submission of the administrative record, legal memoranda, and oral argument, the trial court issued a minute order denying appellant's petition. This appeal followed.[6]

---

[5]Former section 10-3.1510.1, titled "Reconstruction of a garage partially or totally destroyed, damaged, or removed," provides: "A garage which is partially or totally removed, destroyed or damaged by fire or other cause, shall be reconstructed to comply with the zoning regulations in existence at the time of its construction, provided that such garage is accessory to a dwelling unit or units which would become nonconforming because of the loss of the garage or its loss would increase the degree of nonconformity of an existing nonconforming dwelling or apartment house. [¶] Reconstruction of the garage shall be in compliance with the current Uniform Building Code of the City."

[6]Appellant urges, and City agrees, that even though the trial court did not enter a formal judgment denying the petition, an appeal to this court is proper. (See, e.g., *Daggs* v. *Personnel Commission* (1969) 1 Cal.App.3d 925, 930 [82 Cal.Rptr. 157].)

## DISCUSSION

■ Appellant argues that the word "value" in former section 10-3.1510 means fair market value, not replacement cost. The distinction is the crux of the matter. Interpreting value as fair market value would allow appellant to rebuild and continue its nonconforming use whereas interpreting value as replacement cost would prohibit appellant from doing such.

We agree with appellant that "value" in former section 10-3.1510 means fair market value, not replacement cost. " 'Excepting when clearly otherwise intended or indicated, words in a statute should be given their ordinary meaning and receive a sensible construction in accord with the commonly understood meaning thereof.' " (*City of El Monte* v. *City of Industry* (1961) 188 Cal.App.2d 774, 780 [10 Cal.Rptr. 802], quoting *County of Los Angeles* v. *Frisbie* (1942) 19 Cal.2d 634, 642 [122 P.2d 526].)

The ordinary and commonly understood meaning of "value" is fair market value. (*Eltinge & Graziadio Dev. Co.* v. *Childs* (1975) 49 Cal.App.3d 294, 299-300 [122 Cal.Rptr. 369] [value of rental property in declaratory relief action]; *People* v. *Cook* (1965) 233 Cal.App.2d 435, 438 [43 Cal.Rptr. 646] [value of stolen clothes in prosecution for grand theft]; *Bullock's, Inc.* v. *Security-First Nat. Bk.* (1958) 160 Cal.App.2d 277, 281 [325 P.2d 185] [value of rental property in declaratory relief action]; *Van Buskirk* v. *McClenahan* (1958) 163 Cal.App.2d 633, 636 [329 P.2d 924] [value of real property in breach of contract action]; *Wade* v. *Rathbun* (1937) 23 Cal.App.2d Supp. 758, 760 [67 P.2d 765] [value of automobile in effort to execute a judgment]; *Yellen* v. *Fidelity & Casualty Co. of N.Y.* (1931) 115 Cal.App. 434, 441 [1 P.2d 1019] [value of real property in action to recover money damages for injury caused by an injunction]; *Bunnell* v. *Baker* (1930) 104 Cal.App. 313, 317 [285 P. 877] [value of truck in breach of contract action]; *Continental Rubber Wks.* v. *Bernson* (1928) 91 Cal.App. 636, 638 [267 P. 553] [value of automobile tires in action on open account]; *Dean* v. *Hawes* (1916) 29 Cal.App. 689, 693 [157 P. 558] [value of real property in breach of contract action]; *Wickersham Co.* v. *Nichols* (1913) 22 Cal.App. 731, 733 [136 P. 511] [value of jewelry in liability on bond action].)

We realize that none of these cases specifically addresses the meaning of "value" as interpreted in ordinances regarding rebuilding of a nonconforming use. Yet, they are indicative of the commonly understood meaning of "value." " 'The term [value] cannot be given a limited or special meaning as distinguished from its usual definition, unless an intention to so use it appears.' " (*Bullock's, Inc.* v. *Security-First Nat. Bk.*, *supra*, 160 Cal.App.2d 277, 282; *Bunnell* v. *Baker*, *supra*, 104 Cal.App. 313, 317.)

In order to avoid the force of this conclusion, City argues that its administrative interpretation of the word "value" as replacement cost and not fair market value is entitled to great weight and judicial deference. In some circumstances, administrative construction of a law, ordinance or regulation is entitled to great weight. (*DeYoung* v. *City of San Diego* (1983) 147 Cal.App.3d 11, 18 [194 Cal.Rptr. 722].) However, in this case, City has utterly failed to show that it has ever interpreted former section 10-3.1510 as requiring a replacement cost valuation method when faced with a factual situation similar to that posed by the present case. City could not identify even one instance in which such an interpretation had been made. In fact, City failed to show that it had ever formally interpreted former section 10-3.1510. The only "evidence" on this point was the vague and unsworn testimony of the city attorney and a building official. (See fn. 4, *ante*.)

Moreover, City's justification for its staff's informal use of the replacement cost method to determine value is illogical. City urged this methodology was proper because, in accordance with former section 10-3.1511, it has been used to evaluate the enlargement or alteration of a nonconforming structure. Thus, City argues that construing "value" to mean replacement cost is consistent with City's statutory scheme relating to nonconforming uses. That is, since the valuation method in former section 10-3.1511 is replacement cost of the entire nonconforming building, then former section 10-3.1510 should likewise be interpreted to mean replacement cost. The analogy is patently unsound. Former section 10-3.1511 relates to an owner's voluntary decision to enlarge or alter a nonconforming building whereas former section 10-3.1510 relates to reconstruction of a nonconforming building partially destroyed or damaged by an act of God. It is understandable that a stricter valuation standard is used in former section 10-3.1511 because enlarging and altering property is a voluntary act. Former section 10-3.1510, on the other hand, addresses the situation of involuntary damage or destruction following which the owner seeks merely to restore the property to its prior status.

Significantly, the two sections have always had two different standards in their language. When former sections 10-3.1510 and 10-3.1511 were enacted in 1958, section 10-3.1510 used the word "value" as it does today and section 10-3.1511 used the words "assessed value." In 1989, both sections were amended. While former section 10-3.1511 was changed from assessed value to replacement cost, former section 10-3.1510 was left as "value." Thus, City clearly recognized that if it wanted to define value as replacement cost, it should and could explicitly so provide in the code section. City's failure to make a parallel change in former section 10-3.1510 indicates an intent not to define value as replacement cost in that section.

In sum, there is no evidence that City has ever interpreted the word "value" in former section 10-3.1510 to mean replacement cost. City's attempt to engraft the definition of value found in former section 10-3.1511 fails given the legislative history of the two sections and the different factual scenarios addressed by each. We therefore conclude that the word "value" in former section 10-3.1510 should be given its ordinary and commonly understood meaning—fair market value.

## DISPOSITION

The order appealed from is reversed. Appellant shall recover costs on appeal.

Epstein, Acting P. J., and Klein (Brett), J.,* concurred.

Respondent's petition for review by the Supreme Court was denied April 27, 1994.

---

*Judge of the Municipal Court for the Los Angeles Judicial District sitting under assignment by the Chairperson of the Judicial Council.