[Civ. No. 15313.  First Dist., Div. One.  Oct. 29, 1952.]

ALBERT S. BETTELHEIM, Appellant, v. HAGSTROM FOOD STORES, INC. (a Corporation), Respondent.

Nathan G. Gray for Appellant.

Koford, Kitchel & Koford for Respondent.

BRAY, J.—Plaintiff appeals from a judgment in favor of defendant, in an action to recover, under the terms of a lease, penalty rentals for holding over.

### QUESTIONS PRESENTED

Sufficiency of the evidence to support findings as to (1) an executed oral agreement, (2) waiver and estoppel.

### FACTS

The facts are practically undisputed. It is the inferences and conclusions therefrom that are disputed. The following are the facts: Defendant owns a chain of stores. For many years, under leases from various owners, it occupied the premises in question. In December, 1946, plaintiff then holding a master lease of the premises, entered into a three-year sublease with defendant, the term running from May 15, 1947, to May 14, 1950. In May, 1947, plaintiff obtained from the owner of the premises a new 10-year lease. The sublease required defendant to pay a rental of 2 per cent of the gross receipts, with a minimum monthly rental of $500. During the three-year period the rental was paid each month in two checks, one for $500 and an additional one for the balance necessary to equal 2 per cent of the previous monthly gross. Attached to these additional checks was a statement showing the previous month's gross sales and the computation of 2 per cent thereof.

The last check sent in prior to the expiration of the lease, that dated May 11, did not show the gross sales of the previous month, but merely the words "additional rent." Thereafter and during the entire holding over period the additional check each month bore this same legend. About a month before the lease expired one Dodge contacted Hagstrom, defendant's president, and stated he was authorized by plaintiff to negotiate a new lease with defendant. Plaintiff testified that he had authorized Dodge to negotiate a new lease

with defendant or any other person. Dodge told Hagstrom that plaintiff was anxious and willing to make a new lease. Thereupon Hagstrom replied, "I told him, no, we were not interested in a lease at all, but we would be willing to stay under the same terms and conditions that we had been under in the past years." To this Dodge replied that plaintiff was mainly interested in getting defendant to take over either a portion or all of the time left in the master lease; that plaintiff was interested in keeping defendant as a tenant as it was a good tenant. There were at least four conversations between Dodge and Hagstrom on the subject. When asked concerning the other three conversations Hagstrom testified, "The same thing right along on each one of these." On one of Dodge's visits he gave Hagstrom a copy of the master lease. In the meantime the term of the lease had expired, and defendant remained in possession, sending plaintiff each month checks totaling 2 per cent of the previous month's gross receipts. Sometime in December, which was during the seventh month of the holding over, Hagstrom had a phone conversation with plaintiff. Hagstrom testified that plaintiff phoned him and said that Dodge, his agent, had called on Hagstrom several times but had been unable to "make a deal" and plaintiff thought that by calling Hagstrom direct he and Hagstrom could get together. Hagstrom then told plaintiff the same thing he had told Dodge, that on account of parking conditions defendant was not interested in a long term lease. Plaintiff was not asked concerning this conversation other than whether in it he had suggested to Hagstrom that defendant take over the master lease. He stated he did. Shortly after this conversation Dodge delivered to defendant a notice to quit by January 14, 1951. This notice was signed by plaintiff and among other things stated that he was sorry to lose defendant as a tenant, but "I feel that I should have a firm lease and this you were unwilling to give." Defendant surrendered possession as notified. At no time during the eight months' period of holding over did either Dodge or plaintiff claim the penalty rental provided in the lease. Nor was it mentioned in the notice to quit, although in that notice it was stated that if defendant stayed beyond January 14 the rental would be $100 per day.

Plaintiff sued for the difference between 2 per cent and 5 per cent of the gross receipts for the eight months' period. The lease contained a provision that any holding over would be deemed merely a tenancy from month to month at a monthly

rental of "no less than an amount equal to five (5) per cent of said 'gross receipts,' with a minimum rental of Five Hundred Dollars ($500)."

SUFFICIENCY OF EVIDENCE

*1. Executed Oral Agreement.*

█      The court found that during the period of the holding over, defendant occupied the premises "pursuant to a month to month tenancy arrived at by an oral agreement between plaintiff and defendant, which was fully executed."

We are required to consider the evidence and all reasonable inferences therefrom most strongly in favor of the findings. (*Estate of Bristol*, 23 Cal.2d 221 [143 P.2d 689].) Even doing so, we can find no support for the finding that there was an executed oral agreement. The testimony as to the conversations between Dodge and Hagstrom and the latter and plaintiff was very sketchy. While defendant admitted that Dodge was his agent for the purpose of negotiating a new lease, it is doubtful if Dodge's authority authorized him to agree to a modification of the old lease, or to a new month to month tenancy. However, it is unnecessary to discuss the extent of Dodge's authority in this respect, as, even assuming that he had such authority, we are unable to spell out from the discussion of Hagstrom with either Dodge or plaintiff any agreement of any kind, either express or implied. Both Dodge and plaintiff were asking for a lease. Hagstrom was asking to be permitted to stay under the previous terms and conditions. They were still discussing the same matters when the notice to quit was given. Neither Dodge nor plaintiff agreed, either directly or indirectly, to let defendant continue on under the old terms. The most that was done in this respect was to acquiesce in its remaining in possession without any agreement as to terms. However, the insufficiency of the evidence to support this finding does not entitle plaintiff to a reversal of the judgment for the reason that the evidence does support other findings.

*2. Waiver and Estoppel.*

The court found that during the holding over period, defendant paid 2 per cent of the gross receipts, "that plaintiff accepted said payments with full knowledge of the manner in which they were computed and at no time prior to the filing of this suit raised any question as to the sufficiency or correctness of the amounts of said payments or any of them; that plaintiff's acquiescence in defendant's continued occu-

pancy of the premises upon the 2 per cent basis of the prior term, induced defendant to remain in said premises until January 14, 1951'' and by reason of those facts and circumstances plaintiff is estopped from asserting any claim for rentals in excess of the amounts received. In the conversations with both Dodge and plaintiff Hagstrom made it clear that defendant would not enter into a new lease and would only remain in possession under the same terms as they had been paying. As pointed out above, it may be assumed that Dodge had no authority to agree to such terms. Still Dodge admittedly had authority to negotiate a new lease and the statements made to him by Hagstrom he was in duty bound to convey to his principal. That he did is clearly shown by plaintiff's testimony that from time to time he talked to Dodge ''with regard to what he was doing.'' ''As against a principal, both principal and agent are deemed to have notice of whatever either has notice of, and ought, in good faith and the exercise of ordinary care and diligence, to communicate to the other.'' (Civ. Code § 2332.) ▮▮▮ Thus, plaintiff, when he accepted each month sums which were only 2 per cent of the gross (and not 5 per cent as set forth in the penalty clause), knew that defendant was unwilling to stay in the premises on any other basis than a 2 per cent rental. From what Hagstrom told Dodge, which Dodge conveyed or should have conveyed to his principal, the trial court undoubtedly inferred that plaintiff knew that defendant was staying on because it believed it was only being required to pay the 2 per cent. Such an inference is logical and reasonable. It is argued that plaintiff might not have known he was getting only 2 per cent. Plaintiff did not so testify, nor did he testify that in receiving the monthly rentals of only 2 per cent, he thought the other 3 per cent was to be paid later. The total monthly checks during the holding over period as compared with those in evidence during approximately eight months preceding, show that the returns were approximately the same, so much so that it is idle to claim that the person receiving them did not know that the percentage was the same as before nor that he was not receiving two and a half times what he received before. Nor can it reasonably be claimed that plaintiff was misled by the change in the legends on the checks. Prior to the expiration of the lease plaintiff had received at least one check without the 2 per cent notation and the very amounts of the checks subsequently received were notice to him that he was not receiving 5 per cent.

The lease contains a provision to the effect that within 10 days after the expiration of each month lessee shall deliver lessor a written statement showing gross receipts, itemizing certain matters. Then ''no acceptance of any of said written statements or of percentage rental paid thereunder shall constitute an admission of their accuracy, but Lessor may at any time during, or within two (2) years after the expiration of, the term of this lease enforce any payments due him hereunder.'' ''TWELFTH. No waiver by Lessor at any time of any of the terms, conditions, covenants or agreements of this lease shall be deemed or taken unless in writing and signed by Lessor, nor as a waiver at any time thereafter . . . nor of the strict and prompt performance thereof by Lessee. No delay, failure or omission of the Lessor to re-enter the demised premises or to exercise any right, power, privilege or option arising from any default, nor subsequent acceptance of rent then or thereafter accrued, shall impair any such right, power, privilege or option, or be construed to be a waiver of any such default or relinquishment thereof, or acquiescence therein . . .''

''Waiver is the intentional relinquishment of a known right after knowledge of the facts.'' (*Roesch* v. *De Mota,* 24 Cal.2d 563, 572 [150 P.2d 422].) Here, as pointed out above, a logical and reasonable conclusion from the evidence is that plaintiff knew the facts and accepted the rentals with full knowledge that defendant was paying them assuming them to be in full payment. Even a waiver clause may be waived by conduct. That was done here. While a contrary conclusion might have been drawn, such a conclusion is not inevitable or the only reasonable one. In such event we are bound by the conclusion drawn by the trial court. Too, the circumstances as found, in effect, by the trial court cry aloud for the application of the doctrine of estoppel. Plaintiff received rental for eight months longer than he would have received had he not by his conduct misled defendant into thinking the old rental applied. Apparently plaintiff had no tenant to enter during that period as during it all he was endeavoring to get defendant to remain. On the other hand, to apply the penalty would be to inflict a tremendous financial burden on defendant, who, under the circumstances, was justified in concluding that its old rental was being accepted. ''. . . a party to a contract may by conduct or representation waive the performance of a condition thereof or be held estopped by such conduct or representations to deny that he

has waived such performance." (*Panno* v. *Russo*, 82 Cal. App.2d 408, 412 [186 P.2d 452].) *Hacker etc. Co.* v. *Chapman V. Mfg. Co.*, 17 Cal.App.2d 265 [61 P.2d 944], and *Pitt* v. *Mallalieu*, 85 Cal.App.2d 77 [192 P.2d 24], cited by plaintiff, do not apply for the reason that in each of them the evidence failed to disclose knowledge on the part of the one who was claimed to have waived his rights. ▌▌ The language of *C. I. T. Corp.* v. *Hawley*, 34 Cal.App.2d 66 [93 P.2d 216], is applicable here (p. 72): "An estoppel may arise from silence as well as from words or conduct. But this is only where there is a duty to speak, and where the party upon whom such duty rests has an opportunity to speak, and, knowing that the circumstances require him to speak, remains silent. *The circumstances attending the entire transaction must be such as to make it reasonably probable that the person seeking to set up the estoppel has suffered prejudice by the other's unreasonable acquiescence.*" (Emphasis added.) See, also, *Wold* v. *League of the Cross*, 114 Cal.App. 474 [300 P. 57]. The facts of both of those cases are different from ours, and in nowise comparable, but the principle enunciated applies here. In *Julian* v. *Gold*, 214 Cal. 74 [3 P.2d 1009], the court after quoting section 2076, Code of Civil Procedure, said (p. 80): "Under this section, if the lessor was unwilling to accept the amount tendered as in full, he could have protested then, but his acceptance, as in full payment, of a lesser sum than that due, brings him within the rule of estoppel declared by the above section." ▌ In our case, this is so because in spite of any interpretation which may be given to the so-called nonwaiver clauses of the lease, plaintiff knew that the monthly rentals were offered as full payment. Here the estoppel is not based on silence alone but on conduct inconsistent with a reliance upon the strict terms of the lease.

The judgment is affirmed.

Peters, P. J., and Wood (Fred B.), J., concurred.

A petition for a rehearing was denied November 28, 1952, and appellant's petition for a hearing by the Supreme Court was denied December 22, 1952.